Filed 2/28/23; Certified for Publication 3/2/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MIGUEL ANGEL ESTRADA,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Respondent;<br><br>THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>     Real Party in Interest. | A166474<br><br>(San Francisco City & County<br>   Super. Ct. No. 21008360) |
| ANDREW KUHAIKI,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Respondent;<br><br>THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>     Real Party in Interest. | A166508<br><br>(San Francisco City & County<br>   Super. Ct. No. 22004424) |

In these consolidated writ proceedings,[1] petitioners Miguel Angel Estrada and Andrew Kuhaiki (Petitioners) each seek a writ of mandate or prohibition requiring respondent Superior Court of the City and County of San Francisco to dismiss their cases for violating their speedy trial rights under Penal Code section 1382.[2]  Petitioners contend there was no good cause to continue their cases past the statutory deadline, maintaining the superior court can no longer rely on the "exceptional circumstances" resulting from the COVID-19 pandemic.  We conclude the superior court did not abuse its discretion in finding good cause to continue their trial dates past the statutory deadlines or by subsequently denying their motions to dismiss, and therefore deny the petitions.

## BACKGROUND

### *The COVID-19 Pandemic*

Less than a year ago, a different division of this court, in *Hernandez-Valenzuela* (2022) 75 Cal.App.5th 1108, 1117 (*Hernandez-Valenzuela*), considered whether the COVID-19 pandemic constituted "exceptional circumstances" justifying the superior court's finding of good cause to continue criminal cases past the statutory deadlines.  The court thoroughly set forth the background of the COVID-19 pandemic and the public health and judicial response in California, which we recount here.

"On March 4, 2020, Governor Gavin Newsom declared a state of emergency in response to the global outbreak of COVID-19, a 'new disease, caused by a novel (or new) coronavirus that has not previously been seen in humans.'

---

[1]  We ordered the two proceedings consolidated in the November 29, 2022, order to show cause.

[2]  All further undesignated statutory references are to the Penal Code.

2

"On March 16, 2020, the San Francisco Health Officer issued a shelter-in-place order requiring residents of the county to remain in their homes except when engaging in essential activities, and to stay at least six feet apart from other persons when leaving their homes. A few days later, in an attempt to limit the spread of the virus, the Governor issued an executive order requiring all Californians to stay at home except for limited activities.

"On March 23, 2020, Chief Justice Tani Cantil-Sakauye, in her capacity as Chairperson of the Judicial Council, issued an emergency statewide order suspending all jury trials and continuing them for a period of 60 days. The Chief Justice also extended by 60 days the time period provided for in section 1382 for holding a criminal trial. In so ordering, the Chief Justice explained: 'The [Center for Disease Control], the California Department of Public Health, and local county health departments have recommended increasingly stringent social distancing measures of at least six feet between people, and encouraged vulnerable individuals to avoid public spaces. [¶] Courts cannot comply with these health restrictions and continue to operate as they have in the past. Court proceedings require gatherings of court staff, litigants, attorneys, witnesses, and juries, well in excess of the numbers allowed for gathering under current executive and health orders. Many court facilities in California are ill-equipped to effectively allow the social distancing and other public health requirements required to protect people involved in court proceedings and prevent the further spread of COVID-19. Even if court facilities could allow for sufficient social distancing, the closure of schools means that many court employees, litigants, witnesses, and potential jurors cannot leave their homes to attend court proceedings because they must stay home to supervise their children. These restrictions have also made it nearly impossible for courts to assemble juries.'

"On March 30, 2020, the Chief Justice issued a second statewide emergency order, authorizing superior courts to issue implementation orders that '[e]xtend the time period provided in section 1382 of the Penal Code for the holding of a criminal trial by no more than 60 days from the last date on which the statutory deadline otherwise would have expired.'

"On April 29, 2020, the Chief Justice issued a third statewide emergency order, stating:  'The 60-day continuance of criminal jury trials and the 60-day extension of time in which to conduct a criminal trial under Penal Code section 1382, both of which I first authorized in my order of March 23, 2020, are to be extended an additional 30 days.  The total extension of 90 days shall be calculated from the last date on which the trial initially could have been conducted under Penal Code section 1382.'  The Chief Justice explained the extension applied to those matters for which the last date on which trial could be conducted under section 1382 occurred or would occur between March 16, 2020, and June 15, 2020.

"On June 1, 2020, the San Francisco health officer updated the shelter-in-place order to allow outside gatherings but still required that essential government functions comply with social distancing requirements to the greatest extent possible.

"On December 3, 2020, the state public health officer issued a new regional stay-at-home order restoring many of the earlier restrictions in an effort to slow the spread of COVID-19 and avoid overwhelming the state's hospitals in response to an unprecedented surge in the level of community spread of COVID-19.  The next day, in response to the surge in COVID-19 cases, the San Francisco health officer issued another stay-at-home order requiring residents of the county to once again remain in their homes except when engaging in essential activities.  The order was extended on December

30, 2020.  The state's regional stay-at-home order was lifted on January 25, 2021, and the San Francisco health officer allowed for certain businesses and other activities to reopen starting on January 28, 2021.

"On June 15, 2021, the San Francisco health officer's 'Safer Return Together' order came into effect.  The order rescinded the previous stay-at-home order and lifted indoor capacity limits and social distancing requirements." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1114–1116, fns. omitted.)

The San Francisco Superior Court reopened all courtrooms on June 18, 2021.

However, numerous emergency rules and orders regarding the court remained in effect.  The Chief Justice's orders regarding extension of time to hold preliminary examinations, waiver of certain requirements to adopt local rules related to the pandemic, and suspension of any California Rule of Court to the extent it prevented a court from using technology to conduct remote proceedings were not rescinded until April 30, 2022.  The last of these, including emergency rule 3 regarding remote technology in criminal proceedings and emergency rule 5 regarding criminal appearance waivers were not rescinded until June 30, 2022.

San Francisco Department of Public Health requirements for employers and employees regarding COVID-19 remained in effect. (https://sf.gov/step-by-step/what-do-if-someone-work-has-covid-19 [as of February 22, 2023], https://sf.gov/youve-had-close-contact-or-positive-test [as of Feb. 28, 2023].)  Likewise, CalOSHA regulations regarding COVID-19 infections and outbreaks in the workplace continued in effect during the relevant time period.  (Cal. Code Regs, tit. 8, § 3205.1.)  And at the federal

5

level, the Secretary of Health and Human Services Declaration of Public Health Emergency with respect to Covid-19 remained in effect.[3]

***Trial Court Proceedings Against Petitioner Estrada***

In May 2022**,** the San Francisco District Attorney charged defendant Estrada by information with attempted murder (§§ 664, 187, subd. (a)); assault with a deadly weapon (§ 245, subd. (a)(1)); battery with serious bodily injury (§ 243, subd. (d)); mayhem (§ 203); and possession of a switchblade knife in a motor vehicle (§ 21510, subd. (a)), along with various enhancing allegations.

Estrada was arraigned on May 27, 2022, on those charges, entered not guilty pleas, and requested a jury trial on a no-time-waiver basis.

On July 26, 2022, the statutory last day for trial under section 1382, both sides announced they were ready for trial. The court asked the clerk if a courtroom was available, to which the clerk replied: "No, Your Honor. Please find good cause to continue the trial to September 28th." The court granted the continuance, and issued a 16-page written order in which it made extensive findings about the pandemic and the court's response, concluding "due to shelter-in-place orders, social distancing requirements, insufficient courtroom staff and security, and the unavailability of adequate alternative locations to conduct defendant's trial, there is good cause to continue defendant's jury trial past the statutory last day. These circumstances were not caused by chronic court congestion nor the neglect or failure of the Court or the People to adequately provide court services, but solely based on a

---

[3] <https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak#:~:text=The%20Secretary%20of%20Health%20and,in%20response%20to%20COVID%2D19 [as of Feb. 28, 2023]>

6

global pandemic constituting exceptional and extraordinary circumstances warranting a good cause finding. Based on the totality of the circumstances, the Court finds good cause to continue the jury trial in this case and that the length of the continuance is reasonable under the circumstances, the delay is minimal, and the defendant has failed to present evidence of prejudice by the delay. (*People v. Engram* (2010) 50 Cal.4th 1131, 1162-1163 [(*Engram*)]. . . .) As such, the Court finds good cause to continue the jury trial until a courtroom becomes available."

Two months later, Estrada filed a motion to dismiss on the ground their[4] speedy trial right under section 1382 had been violated. The court denied the motion. In its order, it reincorporated its prior good cause findings, and added: "The Court further notes that on July 26, 2022, there were two cases on calendar in Department 22 for trial call. And as of July 26, 2022, there were 300 no-time-waiver felony jury trial cases with a statutory last day earlier than the last day for Defendant's trial. And as of October 11, 2022, there are about 405 pending no-time-waiver felony jury trials. With regard to the number of no-time-waiver felony cases pending trial, the Court further notes that of the 1013 arraignments that have occurred in Department 22 since reopening, there have been 904 cases that have proceeded on a no-time-waiver basis. Additionally, on July 26, 2022, court personnel were unavailable to staff courtrooms because of COVID-19."[5]

---

[4] Estrada prefers use of the they/them pronouns.

[5] Estrada's counsel, in other cases, had objected to this finding, noting "The People did not offer evidence of this fact, and the daily court status reports do not show that courtrooms were dark because of COVID-19-related staff absences." The superior court rejected the claim but granted a continuing objection to the finding, stating "I still believe the sentence is appropriate at this time. I will continue to keep it in the orders. You need

At the hearing, the court expressed frustration with the number of no-time waivers, noting "From January of 2022 to August of 2022, the backlog reduced from approximately 490 felony cases to approximately 350 cases and was continuing to decline. However, these efforts were met with a headwind of no time waivers from the Public Defender's Office in the preliminary hearing departments . . . for both in and out of custody misdemeanor and felony cases at unprecedented levels for the county and the state, reaching approximately 90 percent or higher. [¶] The trial backlog can only be eliminated where the justice partners act to eliminate it. We do not have justice partners at this time; we have civil litigants."

Estrada's trial was continued until November 28, 2022.

### Trial Court Proceedings Against Petitioner Kuhaiki

Petitioner Kuhaiki was charged by information with assault with a deadly weapon (§ 245, subd. (a)(1)); making criminal threats (§ 422); two counts of dissuading a witness by force or threat (§ 136.1, subd. (c)(1)); first degree residential burglary (§ 211); two counts of false imprisonment (§ 236); and inflicting injury on an elder or dependent adult likely to cause great bodily injury (§ 368, subd. (b)(1)). On June 6, 2022, he was arraigned, entered pleas of not guilty, and requested a jury trial on a no-time-waiver basis.

The trial court called Kuhaiki's case on August 5, 2022, the statutory last day for trial. It found good cause to continue the trial "based on the exceptional and extraordinary circumstances caused by the global pandemic. The Court finds those continue to exist through today and will . . . file a

---

not object to it each time. I note your objection to it for all the similar proposed orders."

8

written order in support of the good cause finding." The court issued a 16-page written order with the same findings made in Estrada's case.

Kuhaiki objected to the continuance and orally moved to dismiss his case. The court denied the motion without prejudice to filing a written motion, which Kuhaiki did on September 28, 2022.

The court denied his written motion, using the same language as in the order denying Estrada's motion. It reincorporated its prior good cause findings and added "Additionally, on August 5, 2022, court personnel were unavailable to staff courtrooms because of COVID-19." As it had in Estrada's case, the court rejected Kuhaiki's objection that the prosecutor offered no evidence of this fact.

***Petitioners' Writ Proceedings***

On November 2, 2022, Estrada filed a petition for writ of mandate or prohibition seeking dismissal of their case based on violation of their speedy trial rights and a stay of the trial. One week later, on November 8th, Kuhaiki filed a petition for writ of mandate or prohibition seeking dismissal of his case, but not seeking a stay.

We issued an order to show cause and stay of trial in Estrada's case on November 23rd. On November 29th, we ordered Estrada's writ proceedings consolidated with those of Kuhaiki, stayed trial in Kuhaiki's case, and ordered the People to file a consolidated return to the petitions within 30 days of the order.[6]

---

[6] Respondent superior court sought leave to file an informal response and an extension of time in which to do so. We granted respondent leave to file an amicus brief but declined to extend the time in which to file it beyond November 14th. Respondent declined to file an amicus brief by the ordered deadline, stating it could not "file a meaningful and informative brief under the time parameters." In our November 29th order consolidating the two

9

## DISCUSSION

Petitioners contend the trial court abused its discretion in finding good cause existed to continue their trials past the statutory deadlines. They acknowledge that the court in *Hernandez-Valenzuela, supra,* 75 Cal.App.5th 1108 addressed the same arguments advanced by petitioners—that the inability to get cases to trial is the result of chronic court mismanagement, including unused courtrooms, excessive judicial vacations, and failure to hold trials at the civic center courthouse, and not the result of extraordinary circumstances arising from the COVID-19 pandemic. *Hernandez-Valenzuela* rejected these arguments, holding the "backlog which has delayed petitioners' trials was the result of exceptional circumstances arising from the COVID-19 pandemic." (*Id.* at p. 1134.)

*Hernandez-Valenzuela* cautioned, however, that "respondent court cannot turn to the pandemic and 'perpetually cite "exceptional circumstances" to avoid dismissal under section 1382.' At some future point, should respondent court's backlog persist while courtrooms remain dark and unused for long stretches of time, a backlog that originated with the pandemic could transform into one that persists or grows due to court administration, or the nonuse of available judicial resources. Here, we only decide that on August 16, September 2, and September 24[,] [2021], that point was not reached, and we decline to adopt any outside time limitation or metric that establishes such a point." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1135.)

---

writ proceedings, we granted respondent further time to file an amicus curiae brief, on or before the deadline set for the People's return, but the court never filed a brief.

Petitioners maintain "Respondent [Superior] Court is now long past that point."

## The Hernandez-Valenzuela *Decision*

In order to provide context to petitioners' claims, we set forth the facts and analysis in *Hernandez-Valenzuela* in detail.

### *The Right to Speedy Trial*

*Hernandez-Valenzuela* provided a detailed summary of the applicable law. " 'The right to a speedy trial is a fundamental right guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. [Citation.] The purpose of the speedy trial right is "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." [Citation.] "To implement an accused's constitutional right to a speedy trial, the Legislature enacted section 1382." ' (*Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, 825 . . . ; see also *People v. Sutton* (2010) 48 Cal.4th 533, 545. . . . (*Sutton*) ['[S]ection 1382 is one of the principal provisions implementing a criminal defendant's statutory right to a speedy trial.'].)

"Section 1382 prescribes certain time periods within which an accused must be brought to trial. (§ 1382, subd. (a).) The statute provides that, in a felony case, 'the court shall dismiss the action when a defendant is not brought to trial within 60 days of his or her arraignment on an indictment or information, unless (1) the defendant enters a general waiver of the 60-day trial requirement, (2) the defendant requests or consents (expressly or impliedly) to the setting of a trial date beyond the 60-day period (in which case the defendant shall be brought to trial on the date set for trial or within

11

10 days thereafter), or (3) "good cause" is shown.' (*Sutton, supra,* 48 Cal.4th at p. 545; see also § 1382, subd. (a).)

"'No affirmative showing of prejudice is necessary to obtain a dismissal for violation of the state constitutional speedy trial right as construed and implemented by statute. [Citation.] Instead, "an unexcused delay beyond the time fixed in section 1382 . . . without defendant's consent entitles the defendant to a dismissal." ' (*People v. Martinez* (2000) 22 Cal.4th 750, 766. . . .)

"The prosecution has the burden of establishing good cause to avoid dismissal. (*People v. Johnson* (1980) 26 Cal.3d 557, 569, fn. 12, . . . (*Johnson*); *Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 781, . . . (*Rhinehart*) ['The burden of showing good cause is on the prosecution.'].) '"[I]n making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, 'applying principles of common sense to the totality of the circumstance . . . .' " ' " (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1122–1123, italics omitted.)

" ' "The cases recognize that, as a general matter, a trial court 'has broad discretion to determine whether good cause exists to grant a continuance of the trial' [citation], and that, in reviewing a trial court's good-cause determination, an appellate court applies an 'abuse of discretion standard." ' (*[Engram, supra,]* 50 Cal.4th 1131, 1163. . . .)" (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1122–1123.)

### *Meaning of Good Cause*

" ' "[S]ection 1382 does not define 'good cause' as that term is used in the provision, but numerous California appellate decisions that have reviewed good-cause determinations under this statute demonstrate that, in general, a number of factors are relevant to a determination of good cause: (1)

the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay." ' (*Engram*, *supra*, 50 Cal.4th at pp. 1162–1163.)" (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at p. 1124.)

"In reviewing a trial court's exercise of its discretion in determining what constitutes good cause, 'the appellate courts have evolved certain general principles. The courts agree, for example, that delay caused by the conduct of the defendant constitutes good cause to deny his motion to dismiss. Delay for defendant's benefit also constitutes good cause. Finally, delay arising from unforeseen circumstances, such as the unexpected illness or unavailability of counsel or witnesses constitutes good cause to avoid dismissal.' (*Johnson*, *supra*, 26 Cal.3d at p. 570. . . .)" (*Hernandez-Valenzuela*, *supra*, 75 Cal.App.5th at p. 1124.)

" '[A] broad variety of unforeseen events may establish good cause under section 1382.' (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1198 . . . (*Hajjaj*).) For instance, in *In re Venable* (1927) 86 Cal.App. 585 . . . , an epidemic of infantile paralysis was prevalent in the town where court sessions were held and prohibited calling juries. (*Id*. at p. 587.) The court concluded the quarantine imposed to prevent the spread of the infectious disease was good cause for the delay of trial and found there was no unreasonable delay in bringing the case to trial after the cessation of the epidemic. (*Id*. at p. 587.) In *People v. Tucker* (2011) 196 Cal.App.4th 1313 . . . , the defendant could not appear for trial as he was under quarantine because another inmate had contracted the H1N1 flu virus. (*Id*. at p. 1315.) The court concluded that medical necessity of the defendant's quarantine constituted good cause for the continuance of his trial. (*Id*. at pp. 1317–1318.) More recently, in *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164 . . . ,

13

Division Four of this court concluded the COVID-19 pandemic and impact it has had within the state supported the trial court's finding of good cause to continue the defendant's trial. (*Id.* at p. 166.) The court observed that the COVID-19 pandemic was 'of such severity' as to justify a 90-day continuance and observed that courts were places of high risk during the pandemic given they involved gatherings of judges, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries in excess of the numbers allowed for gatherings under the then applicable executive and health orders. (*Id.* at pp. 169–170 ['Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date.'].)" (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1124–1125.)

### *Good Cause to Continue in Summer 2021*

*Hernandez-Valenzuela* considered whether good cause had been shown for continuances of trials approximately two months after reopening of the San Francisco Superior Court, in the late summer/early fall of 2021.[7] (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1117.)

The court first addressed the backlog of no-time-waiver cases and whether it was "attributable to exceptional circumstances connected to the COVID-19 pandemic [or] chronic conditions in [the superior] court." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1127.) It noted there was no dispute the " 'backlog was originally caused by public health restrictions to combat the COVID-19 pandemic.' Thus, the backlog petitioners' cases were a

---

[7] *Hernandez-Valenzuela* was also a consolidated writ proceeding involving two defendants. (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1113.) Defendant Valdivia Torres maintained his speedy trial rights were violated by the continuances of his trial granted on August 16 and September 2, 2021, while defendant Hernandez-Valenzuela contended his speedy trial rights were violated by a continuance granted on September 24th. (*Id.* at p. 1121.)

14

part of was due at least in part to the pandemic and thus far from a routine event." (*Id.* at p. 1130.)

The court observed: "[t]he COVID-19 pandemic has been a ' "unique, nonrecurring event[]" ' which ' "ha[s] produced an inordinate number of cases for court disposition," ' and thus exceptional circumstances justifying delay of petitioner's trial. (*Johnson, supra*, 26 Cal.3d at p. 571.) From early March 2020 to June 28, 2021—when respondent court fully reopened—respondent court was unable to operate at its usual capacity for approximately 15 months due to safety orders imposed by health officers in response to the pandemic. During three of the 15 months, jury trials were suspended by the Chief Justice's statewide emergency orders. The Chief Justice's blanket 90-day extension of the last days of all criminal jury trials with last days between March 16, 2020, and June 15, 2020, reflected the challenge of conducting jury trials during the pandemic. As the Chief Justice explained, courts were a 'high risk' environment during the pandemic given they required the assembly of judges, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries in excess of the number allowed for gathering under governing health orders. Criminal jury trials in respondent court were suspended again for another month during the surge of community spread of COVID-19 in December 2020. During the other months that jury trials were not suspended, respondent court was limited to using only four of its 10 trial courtrooms for criminal jury trials due to social distancing requirements imposed by health orders. None of these events were the fault of the prosecution or respondent court but rather the unprecedented effects of the pandemic.

"When respondent court reopened on June 28, 2021, after 15 months of diminished or no capacity to conduct criminal jury trials, it was not

15

surprising that it confronted an ' "inordinate number of cases for court disposition." ' (*Johnson*, *supra*, 26 Cal.3d at p. 571.) The pandemic had severely limited its ability to conduct jury trials. Upon reopening, scores of no-time-waiver felony cases past their statutory day had accumulated during the 15-month period of limited operations. As of August 29, 2021, respondent court's jury trial list indicated there were approximately 220 no-time-waiver felony cases with original last days sometime in the 15-month period before reopening. The District Attorney explains that respondent court attempted to address this backlog by prioritizing older cases first when it reopened. Respondent court assigned trials out in order of their statutory last days, prioritizing three courtrooms for in-custody felony trials, and maintaining the remaining courtrooms for out-of-custody trials with earlier last days.

"It was in this context in which petitioners' trials were called and continued on August 16, September 2, and September 24, [2021], since on those dates other defendants with earlier last days than petitioners—most of whom with last days falling within the 15-month period before reopening— were still awaiting trial. After 15 months of constrained operations resulting in a backlog of numerous no-time-waiver cases, it was not unreasonable for respondent court to not have addressed its backlog within seven, nine, or twelve weeks of reopening, that is, by Valdivia Torres's August 16 and September 2 last days, or by Hernandez-Valenzuela's September 24 last day. Moreover, it was not unreasonable after those 15 months for the court to need some latitude to determine how best to address[] its backlog, while the pandemic persisted despite the full reopening. (See *Sutton*, *supra*, 48 Cal.4th at p. 555, fn. 10 [quoting ABA standards which observe that it is unfeasible to expect the same prompt disposition of court business when a unique, nonrecurring event results in many cases for disposition and advocating for

16

' "some leeway for additional time" ' in such circumstances].) The method the court chose of advancing cases from the backlog by order of their statutory last days did not reflect court mismanagement. Rather, it was a reasonable approach in line with priorities set forth in section 1048[8] and not detrimental to the good cause finding. Based on the totality of these circumstances, it was not an abuse of discretion for the respondent court to conclude that the backlog delaying petitioners' cases was attributable to exceptional circumstances constituting good cause and to continue their trials." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1127–1129.)

The petitioners nevertheless asserted the backlog in the superior court was due to " 'poor administration,' " as evidenced by dark courtrooms at the Hall of Justice due to judicial vacations or absences, and failure to reassign additional courtrooms to hear jury trials, including at the civic center courthouse. (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1130–1133, 1142.)

*Hernandez-Valenzuela* addressed and rejected these claims. "[E]mpty or available courtrooms," both during the period since reopening and on the dates petitioners' cases were called, did "not mean respondent court was not undertaking efforts to reduce its backlog." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1131.) Although the empty courtrooms were "startling

---

[8] "Section 1048 provides in part: '(a) The issues on the calendar shall be disposed of in the following order, unless for good cause the court directs an action to be tried out of its order:

(1) Prosecutions for felony, when the defendant is in custody.

(2) Prosecutions for misdemeanor, when the defendant is in custody.

(3) Prosecutions for felony, when the defendant is on bail.

(4) Prosecutions for misdemeanor, when the defendant is on bail.' (§ 1048, subd. (a)(1)–(4).)"

17

and troubling," the evidence showed the court had advanced "221 no-time waiver felony trials" in the six months since reopening. (*Ibid*.)

*Hernandez-Valenzuela* also rejected the claim that failure to use the Civic Center Courthouse for criminal trials evidenced court mismanagement and precluded a good cause finding. (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1133.) It observed the superior court had "noted that use of the Civic Center Courthouse was not a viable option . . . because of the inability to provide adequate security [and because] there were not enough bailiffs to staff each courtroom." (*Id*. at pp. 1133–1134.) The evidence showed "Civic Center Courthouse lacked security devices designed to prevent escape, which are features of the Hall of Justice. For additional in-custody criminal matters at the Civic Center Courthouse, additional holding cells would need to be constructed, and various locks and cameras, secure entrances, and additional emergency communication devices would need to be installed. In addition, thirteen more full-time sheriff staff would be needed to staff additional criminal matters at the Civic Center Courthouse. These security and structural concerns related to the Civic Center Courthouse provide further reason to not fault respondent court from not assigning additional criminal matters there." (*Id*. at p. 1134.)

### Petitioners' Assertions Regarding Lack of Good Cause

Petitioners make the same claim advanced in *Hernandez-Valenzuela*—that the shortage of trial capacity on their last no-waiver trial dates was the result of the superior court's "chronic, needless underuse of its trial resources over thirteen months," due to the "combined result of courtroom closures due to judicial vacations and a remarkably inefficient trial assignment system." They also take issue with the court's comments about the number of defendants proceeding on a no-time waiver basis, asserting exercise of their

18

statutory rights does not constitute good cause, and the court failed to consider the "severe psychological harm" to defendants "forced to wait in jail" "under extreme lockdown conditions that risk grave damage to [their] mental health." (Italics omitted.)

### *Underuse of Trial Resources*

Petitioners concede that by the time of reopening in June 2021, there was "a massive backlog of criminal trials," (italics omitted) but claim the backlog should have been cleared by the time of their statutory dates because the superior court announced that it was returning to " 'pre-pandemic' levels of service on June 28, 2021," and "our criminal justice system has gradually returned to normal."

In June 2021, the superior court reopened the 11 trial departments in the Hall of Justice that were open before the pandemic—Departments 10, 13, 16, 19, 21, and 24–29. There were around 562 cases waiting to be tried, including about 155 felony cases in which the defendant was in custody

Petitioners have submitted hundreds of pages of "Criminal Daily Court Status Report[s]" (some capitalization omitted) produced by the court (specifically reports from June 28 through August 8, 2022). Using these reports, petitioners calculated that "on an average day" in the 11-month period between July 1, 2021 and May 31, 2022, 56 percent of the 11 trial departments were holding trials.

These status reports also noted reasons why the dark courtrooms were dark. The most common reason, responsible for 48 percent of the 182 dark days from June 1 to August 8, 2022, was a judge's " 'approved absence,' " " 'scheduled absence' " or " 'excused absence.' " The second most-common reason, responsible for 33 percent of dark courtrooms, was "Covering another department," while the third most common reason, responsible for eight

19

percent of dark courtrooms, was "Official business." Of the judicial absences resulting in a dark courtroom day during that time period, 54 percent were due to vacations, 14 percent were due to being on, or covering for another judge on, official business, nine percent were due to medical leave or covering for another judge on medical leave, and five percent were due to personal leave.

As petitioners point out, "[i]t is settled that, although a broad variety of unforeseen events may establish good cause under section 1382, the unavailability of a number of judges or courtrooms sufficient to handle the court's caseload, due to chronic congestion of the court's docket, does not establish good cause, absent exceptional circumstances." (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1198; *Rhinehart v. Municipal* Court (1984) 35 Cal.3d 772, 783 [judicial vacations alone do not constitute good cause for trial delay].) Neither does the absence of judges due to their attendance at a " 'mid-career' training program," when no good cause appeared why the court "fail[ed] to recall [them] from the conference to try these cases." (*Lewis v. Superior Court* (1981) 122 Cal.App.3d 494, 498–499 (*Lewis*).)

However, contrary to petitioners' claims, and unlike in the cases they cite, the evidence does not show that judicial vacations, alone, were the cause of either the backlog of cases or the lack of court room availability at the time in question.

To begin with, it is unremarkable that during the traditional summer vacation months of June, July, and August 2022, numerous judges were taking vacation days. And petitioners' statistics obfuscate the true number of judicial vacation days during that time period. Of the 182 dark courtroom days during that time period, only 88 were due to judicial absences. Of those 88 days, only 71 were judicial vacations, or 39 percent of the total dark

20

courtroom days during that time period.  Nor did the backlog develop during *that* time period, and forbidding judges to take vacation days, even if that were possible, would not have alleviated it.  In short, unlike in *Lewis*, petitioners' cases could not have proceeded to trial simply by recalling judges from a nearby training session.  (*Lewis*, *supra*, 122 Cal.App.3d at pp. 498–499.)

Petitioners cite no authority for the proposition that allowing judges to take vacation days or cover for other absent judges is trial court mismanagement.  Indeed, they admit that "when a trial judge covers for an absent colleague, that judge sometimes conducts his or her own regularly assigned calendar as well as covering the other department."  And as *Hernandez-Valenzuela* concluded, the massive backlog in the summer of 2021 was the result of the COVID-19 pandemic, and the evidence in the instant writ proceedings shows the pandemic and its attendant disruptions, while somewhat abated, certainly had not ceased.

Moreover, the superior court had made significant progress in clearing the backlog of cases awaiting trial since the dates at issue in *Hernandez-Valenzuela*.  The court had reduced its backlog of felony in-custody no-time-waiver trials from 280 cases in February 2022 to 192 cases in July 2022, with the backlog rising slightly to 204 cases in September 2022.  The court had also reduced its backlog of felony out-of-custody no-time-waiver trials, from 202 cases in February, to 182 cases in July, to 170 cases in September of 2022.  Although petitioners point to the fact the backlog had increased between June 2021 and February 2022, that time period ended almost six months before the good cause determination in these cases and during *that* six-month period the court made substantial progress reducing the backlog.  Moreover, it did so while criminal cases continued to be filed and without

21

additional court facilities or judgeships. This reflects responsive management, rather than mismanagement, of court resources.

Petitioners acknowledge that as of May 2022, the court's records indicate 89 percent of the 11 trial courtrooms were in use. But they assert that beginning in mid-May, the court's " 'HOJ Courts in Trial' " statistics were overstated because they included "out-of-custody trials that had been assigned to departments for all purposes, but had not actually started." Thus, as defendants calculated it, there were an average of eight courtrooms that were actually in trial each day in May 2022, not the 9.8 average calculated using the " 'HOJ Courts in Trial' " statistics. However, even accepting petitioners' calculation, this still meant 73 percent of the 11 courtrooms were in use—a dramatic increase from the 33 percent and 28 percent, respectively, for the months of August, and September 2021 at issue in *Hernandez-Valenzuela.* And on the last days for trial for Estrada and Kuhaiki, 73 percent of the 11 courtrooms were again in use.[9]

*Hernandez-Valenzuela* addressed whether open courtrooms evidenced court mismanagement and "disagree[d] that the open courtrooms preclude respondent court's good cause finding." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1130.) The court observed that in *Hajjaj, supra,* 50 Cal.4th 1184, "the Supreme Court recognized that 'a broad variety of unforeseen events may establish good cause under section 1382' and that the unavailability of judges or courtrooms sufficient to handle a court's caseload due to chronic congestion of the court's docket was not such an event. (*Id.* at p. 1198. . . .) In contrast, the backlog pending in respondent court at issue

---

[9] Petitioners' evidence showed there were three dark courtrooms on both July 26 (Estrada) and August 5, 2022 (Kuhaiki). A fourth courtroom was "dark during trial" on August 5th.

here has not been due to chronic congestion, but rather the result of a global pandemic—a 'unique, nonrecurring event[ ] [that has] produced an inordinate number of cases for disposition' and which may properly [be] regarded as an exceptional circumstance that would support a court's good cause determination. (See *id*. at p. 1204; *Johnson*, *supra*, 26 Cal.3d at p. 571; see also *Arreola v. Municipal Court* (1983) 139 Cal.App.3d 108, 114 . . . ['While chronic congestion will not constitute good cause, court backlogs caused by exceptional circumstances will excuse delay in bringing a defendant to trial.'].)" (*Hernandez-Valenzuela*, at p. 1130, italics omitted.)

We also observe that while petitioners, in the trial court, complained about lack of use of the Civic Center Courthouse, they have not pursued this complaint in the instant writ proceeding. *Hernandez-Valenzuela* concluded that the "security and structural concerns related to the Civic Center Courthouse [were] reason to not fault respondent court from not assigning additional criminal matters there." (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1134.) Here, the superior court, after detailing the circumstances surrounding use of that courthouse, found "the Civic Center Courthouse has not been a viable option for either in-custody or violent out of custody criminal trials. However, with the lifting of shelter-in-place orders and the relaxing of social distancing requirements, in addition to the return of additional judicial officers, staff, and bailiffs, the Court has begun to send more non-violent out-of-custody trials to the Civic Center Courthouse. Judges at the Civic Center Courthouse have been instructed by the Presiding Judge of the Superior Court that no time waiver jury trials will be given highest priority at that courthouse." Thus, the court has also made

significant efforts to utilize its Civic Center facility to assist in working through the backlog of no time waiver cases.[10]

While petitioners insist the persisting, but steadily diminishing, backlog of no time waiver cases in the San Francisco Superior Court can no longer be attributed to the effects of the COVID-19 pandemic, the evidence simply does not support this claim. The backlog that resulted from the court closures and the later disruptions from surges and new variants is not a problem that can reasonably be expected to have dissipated within only months or even a year or two, particularly given the continued filing of new criminal cases.

### *Superior Court's Findings*

The superior court took judicial notice of its "records, policies, procedures, courtroom facilities, and operations during the relevant periods of the COVID-19 pandemic and the Emergency Orders and Rules issued by the Governor, the Chief Justice, the Judicial Council, the Presiding Judge of the San Francisco Superior Court, San Francisco County Health Officer, the State of California Department of Public Health, and any other local or statewide governmental agency . . . issued in response to the COVID-19 pandemic," as well as its own records, practices, and official acts taken during the pandemic. And based thereon, it made extensive findings in support of its 16-page orders finding good cause to continue petitioners' the trials.

---

[10] Petitioners also claim there must be mismanagement at the San Francisco Superior Court because other superior courts have eliminated their COVID-19 related backlogs. Suffice it to say that without an examination of the circumstances, including the number of no-time-waiver cases, facilities, and personnel at those courts, and an analysis of the similarities and differences—evidence petitioners did not present—this assertion is meaningless.

The court found: "even with the reopening of the courtrooms, isolation and quarantine requirements persisted in San Francisco, surrounding counties, the State, and under CDC guidelines. These requirements caused significant delays during the trials that were in session as well as hampered the Court in sending out trials at a similar pace prior to the pandemic. [¶] Since the recent emergence of the delta and omicron variants of the coronavirus, the Court has again had to balance the safety of the public, the staff, the defendants, and the attorneys with the right to a speedy and public trial. The increase in infections due to these new variants has caused concerns with potential jurors, affected the readiness of witnesses, and decreased the appearances of defendants. The delta and omicron variants have impacted both the unvaccinated and the vaccinated. On December 13, 2021, the State reinstituted the indoor mask mandate in all public settings regardless of vaccination status. San Francisco has not been immune from the spread, and as of January 3, 2022, it had the third highest transmission rate in the state. Governor Newsom extended the state of emergency to March 21, 2022."

As to the issues regarding the Sheriff's Department, the court found "the Sheriff's Department is already stretched for staffing at the county jails and the Hall of Justice due to retirements, resignations, and staffing shortages caused by the global pandemic." "The massive spread of these new variants has had a substantial impact on court staff and sheriff's deputies. In early January of 2022, numerous sheriff's deputies were unavailable due to the new variants. Trial judges were forced to make good cause findings to continue active trials [until] adequate deputies became available. For example, on one particular day, the Sheriff's Department was short 13 deputies at the Hall of Justice. Some trials were forced to have dark days

25

during the trial because there were not enough bailiffs to staff the courtrooms. This, of course, lengthened the time of each trial, contributing to the backlog. This also hampered sending new cases out to trial because there were not enough deputies to secure open courtrooms. The Court was informed by the Sheriff's command staff that the bailiff shortage is anticipated to continue through March of 2022. The number of sheriff deputies has diminished by over 200 members since the onset of the pandemic. This bailiff shortage, which has been a problem since the beginning of the pandemic, has substantially increased since the emergence of the delta and omicron variants. The shortage has also impacted the ability of the courts to conduct anything more than one or two misdemeanor non-violent criminal cases at a time at the Hall of Justice."

"The recent spread of the variants also impacted court staff and judicial officers. In January of 2022, there was a mistrial declared after two jurors and a deputy public defend[er], who was 32-weeks pregnant tested positive for the virus. In addition, the judicial officer and the entire courtroom staff assigned to the case were forced to stay home due to potential exposure, eliminating the use of the courtroom for other trials. In a separate case, a judge tested positive during a trial and had to isolate for close to two weeks causing a delay in the proceedings. Other judges who have either tested positive, been exposed to someone who has tested positive, or live with vulnerable individuals have been forced to remain home requiring the Court to shift judicial resources to cover those judges in their absence, or to designate a courtroom dark. These circumstances have substantially impacted the Court's functioning and operating ability."

The court further found that "in May of 2022, the Bay Area again began experiencing a massive spike in positive cases impacting the courts.

26

There were numerous judges, staff, attorneys, jury trial witnesses, and jurors unable to appear in court from May of 2022 until the present. During this same time period, the Court's Human Resource Department declared all three floors of the Hall of Justice in 'outbreak' status in accordance with applicable law and CalOSHA guidelines. The virus continues to disrupt our everyday lives, the judicial process is no exception."

While petitioners acknowledge that the court made these and other factual findings about the continuing effect of the COVID-19 pandemic on its operations, they complain the orders were "boilerplate" and the findings unsupported by any evidence.

With respect to petitioners' complaint that the court issued "boilerplate" orders, it is well settled that a trial court has "inherent power to exercise reasonable control over litigation pending before it ' "in order to ensure the orderly administration of justice." ' (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 . . . ; see §§ 128, subd. (a)(3), 187.) These inherent powers primarily encompass 'procedural matters, typically to control the court's own process, proceedings and orders,' or to create 'workable means' to enforce statutory rights." (*Carlsbad Police Officers Assn. v. City of Carlsbad* (2020) 49 Cal.App.5th 135, 150–151, italics omitted.) Given the hundreds of cases in which defendants had not waived time, a boilerplate order setting forth the background of the COVID-19 pandemic and the court's response was not only within the trial court's discretion, but a time-efficient way of addressing motions to dismiss.

With respect to the evidence supporting the court's findings, petitioners assert "the court's own records" show that from April 1 through August 8, 2022, "only six dark days . . . were caused by COVID-19 protocols, courtroom capacity limits, or 'staffing' issues." Thus, they maintain "[t]hese statistics

hardly support the notion that COVID-19-related staffing problems were to blame for the continuance[s]," specifically disputing the court's findings that on the petitioners' last days for trial "court personnel were unavailable to staff courtrooms because of COVID-19."

Petitioners acknowledge the finding that a new outbreak of COVID-19 occurred at the Hall of Justice in May 2022, but suggest the outbreak had little effect on court administration. They assert an outbreak "simply means that the worksite must report the matter to the local health department and that employees must wear masks and test regularly for infection. It does not require the closure of any courtroom, and so cannot justify delaying trials for months." (Fn. omitted.)

Petitioners are mistaken. A workplace "outbreak" in San Francisco is defined as "when three or more employees have COVID-19 in a two-week period." (https://sf.gov/step-by-step/what-do-if-someone-work-has-covid-19 [as of Feb. 28, 2023].) Although the outbreak must be reported to the San Francisco Department of Public Health, that is not the only requirement. (*Ibid.*) The employer must "[t]alk with the employee who tested positive," determine when they tested positive or their symptoms began, make a list of "close contacts," (which includes anyone the individual has been indoors with for more than 15 minutes, even if wearing a mask), and inform those contacts they have been exposed. (*Ibid.*) Individuals who test positive, with or without symptoms, must "stay home and away from others for [five] days." (https://sf.gov/youve-had-close-contact-or-positive-test [as of Feb. 28, 2023].) An individual who still tests positive after five days must stay home until a negative COVID-19 test or 10 days have passed since the first positive test, whichever comes first. (*Ibid.*)

Thus, an "outbreak" results in significant disruption to the superior court, as the court must contact individuals with positive tests, identify their "close contacts," and inform them of possible exposure. At the same time, the individuals who have tested positive must isolate at home for between 5-10 days. While it is true, as petitioners claim, that the San Francisco Public Health Department does not require a courtroom closure during an outbreak, trial delays are the natural result as judges, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and jurors are required to test and isolate.

Petitioners also take issue with the superior court's finding that, on petitioners' last statutory days for trial, "court personnel were unavailable to staff courtrooms because of COVID-19," claiming "this assertion is wholly unsupported by the evidence."[11] The court, however, took judicial notice of its own "findings, records, policies, procedures, courtroom facilities, and operations during the relevant periods of the COVID-19 pandemic." Petitioners do not challenge the propriety of the court taking judicial notice of these matters, and consequently have failed to show this finding was unsupported by the evidence.

### *Practices of Public Defender's Office*

In addition to the foregoing findings, the superior court found two practices of the San Francisco Public Defender's Office had contributed to the no time waiver backlog.

The first was the unprecedented increase in no time waiver felony cases. The court found that before the pandemic, "about 58.9% of the

---

[11] We note this finding does not necessarily mean the judge had COVID-19, but rather, due to the overall effects of the COVID-19 pandemic on the court, personnel were unavailable to staff courtrooms that day.

29

defendants arraigned on a Felony Information set their cases for trial on a no time waiver basis. . . . From January 1, 2021 to July 13, 2021, during the height of the pandemic, the number of felony defendants who asserted their right to a speedy trial increased to 81.1%. Since the reopening, the number of felony defendants who asserted their right to a speedy trial has grown to approximately 96%."

Petitioners maintain that asserting their rights to a speedy trial and declining to waive time cannot be considered good cause, citing *Arreola v. Municipal Court* (1983) 139 Cal.App.3d 108 (*Arreola*). In that case, due to certain policies of the court and district attorney's office, the public defender counseled clients to plead not guilty and request a trial rather than seek a plea bargain. (*Id*. at p. 112.) A backlog of 100 cases awaiting trial developed, but the court denied motions to dismiss for failure to timely bring the cases to trial. (*Ibid*.) The defendants sought writ relief, which the Court of Appeal granted.

The appellate court first observed that "delay caused by chronic court congestion and overcrowding is not good cause. [Citation.] If the contrary were true, '[a] defendant's right to a speedy trial may be denied simply by the failure of the state to provide enough courtrooms or judges to enable defendant to come to trial within the statutory period.' [Citation.] Insufficient allocations of admittedly limited public funds should not justify the deprivation of the right to speedy trial." (*Arreola*, *supra*,139 Cal.App.3d at pp. 113–114, fns. omitted.) It went on to conclude that the exercise of speedy trial rights could not, "even in unprecedented numbers," be called "an exceptional circumstance. The state must stand ready to provide a jury trial to every defendant. The state may not demand as a price in exchange therefor that a defendant give up the right to a speedy disposition of the

30

cause. As a matter of policy the 'courts should not participate in, or encourage, a procedure which obliges the accused to forfeit one constitutional right in order to retain the protection of another.' " (*Id*. at p. 115.)

The circumstances in *Arreola* differ markedly from those at hand. In *Arreola*, the defendants exercised their speedy trial rights in response to perceived stricter policies adopted by the master calendar judge and the district attorney. In other words, the sole reason for the backlog were policies the court and district attorney had unilaterally enacted. The circumstances here are entirely different. At bottom, the principal reason for the backlog and the court's facility and personnel difficulties in the instant proceeding was continuing fallout from the COVID-19 pandemic.

We are not questioning petitioners' right to assert their speedy trial rights. Rather, their doing so is simply another consequence of the pandemic that has magnified the pandemic's impact on court facilities and personnel.

The second practice the court commented on was "assigning deputy public defenders to 'second chair' cases . . . diminish[ing] the number of cases that can be sent out to trial due to the 'second chair' attorney's unavailability." The court further found since "[t]here are six individual public defenders responsible for approximately 35% of the entire trial backlog, their unavailability contributes significantly to the delay in getting trials out and reducing the backlog."[12] Petitioners do not contest those

---

[12] Real party maintains other defense practices have also contributed to the backlog, including waiting until after a case has been assigned to a trial courtroom to enter into a plea agreement, move to continue, or declare a doubt as to competency, citing to exhibits lodged with its return. Although these documents were not submitted to the trial court, real party asserts that the court's taking judicial notice of its operating procedures meant "this information was before Respondent Court."

findings.  Accordingly, we accept them as true for the purposes of this proceeding.  (See *People v. Superior Court* (*J.C. Penney Corp., Inc.*) (2019) 34 Cal.App.5th 376, 406, fn. 18.)  And as we have observed, " '[d]elay for defendant's benefit,' " such as the presence of second chair counsel, constitutes good cause to deny a motion to dismiss.  (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at p. 1124, quoting *Johnson, supra,* 26 Cal.3d at p. 570.)

***Summary***

In sum, considering the totality of the circumstances, we conclude the continued, but abating, backlog at the time in question was primarily the result of exceptional circumstances arising from a " 'unique, nonrecurring event' "—the continuing consequences of the COVID-19 pandemic. (*Hernandez-Valenzuela, supra,* 75 Cal.App.5th at pp. 1130, 1135, italics omitted.)  Accordingly, the superior court did not abuse its discretion in finding that good cause existed to continue petitioners' trials, and thus did not err in denying their motions to dismiss under section 1382.

---

Petitioners, on the other hand, have sought to strike exhibits 1, 2, 7, 8, 9, and 10, as well as exhibits 1–3 submitted by real party with its the preliminary opposition.  These exhibits consist of over 2000 pages of documents, including the declaration of a deputy district attorney, a spreadsheet of all cases assigned to a courtroom from June 18, 2021, through December 16, 2022, and a Case Management System printout and minute orders for each case in the spreadsheet.

We do not agree the court's judicial notice encompassed the truth of the contents of thousands of pages of court records and grant the motion to strike to the extent the documents comprising these exhibits were not before the superior court at the time it ruled on these motions.  (See *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.)

32

*Consideration of Prejudice to Petitioners*

Petitioners additionally assert the superior court failed to consider the prejudice to them resulting from continuance of their cases. They claim they have been "waiting in county jail past [their] last day, under extreme lockdown conditions that risk grave damage to [their] mental health."[13] However, as petitioners point out, no showing of prejudice is necessary to prevail on a section 1382 motion to dismiss.[14] Thus, it is unsurprising that the trial court did not expressly mention it in its order.

That does not mean, however, that the court did not consider petitioners' submitted evidence of prejudice. Indeed, the court indicated at the hearing it had reviewed all the "paperwork" submitted, and we presume the court "regularly performed its official duties." (*People v. Sparks* (1968) 262 Cal.App.2d 597, 600.)

In any event, prejudice is not necessarily shown by "lengthy incarceration during pendency of . . . unresolved criminal charges." (*Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 943 (*Elias*).) *Elias,* considering whether the defendant's continued pretrial incarceration was prejudicial applying the balancing test for the federal Constitution's speedy trial right, concluded the defendant "is in the same position as hundreds of other in-custody defendants awaiting trial due to COVID-19 pandemic delays." (*Id.* at pp. 938, 943.) Moreover, the People submitted evidence in the trial court that

---

[13] In a letter to this court, Estrada corrected their earlier allegation, stating they have been housed in a "special, dormitory-style pod" in county jail, and have not been subject to "the lockdown conditions faced by other inmates" as asserted in the petition, undercutting their prejudice claim.

[14] Petitioners concede they are not asserting a Sixth Amendment claim.

33

the allegedly harsher conditions in the county jails during the COVID-19 lockdown have been improved, with programs and visitation reinstated.

### *Changes Suggested by* Hernandez-Valenzuela

Petitioners also claim the San Francisco Superior Court has failed to implement the changes suggested in *Hernandez-Valenzuela.*

*Hernandez-Valenzuela* "urge[d] respondent court to consider even more measures to adopt, which could include but are not limited to expanding the number of trial courtrooms in the Hall of Justice beyond the number that was standard pre-pandemic, reassigning additional judicial officers from other departments in the Civic Center Courthouse or Hall of Justice, or using visiting or retired judges to cover courtroom vacancies. Respondent court's backlog which was borne of exceptional circumstances must be met with an equally exceptional response to ensure that our recognition of a defendant's speedy trial rights as a critical constitutional protection is not merely lip service." (*Hernandez-Valenzuela, supra*, 75 Cal.App.5th at p. 1136.)

Well aware of *Hernandez-Valenzuela*, the superior court detailed the changes that had been made in the ensuing year. The court had "added an additional trial courtroom at the Hall of Justice, utilized judicial officers and additional clerical staff from the Civic Center Courthouse and the visiting and retired judges' programs to assist with trial, and sought the assistance of a retired judge for additional settlement conferences. In addition, based on extensive discussion with the Sheriff's Department, the Court will begin to send three to four misdemeanor cases to the Civi[c] Center Courthouse by then end of July of 2022. The Court is still working on trying to get the Sheriff's Department to a staffing level to handle out of custody felony matters. It does not appear they will be able to handle in-custody felony matters at any time in the foreseeable future." Indeed, petitioners concede

"Respondent court often calls on visiting judges to handle gaps in its staffing or to hold pretrial conferences."

" 'It is not our function to interfere with the trial court in its administration of the calendar or assignment of judges.' " (*Hernandez-Valenzuela, supra*, 75 Cal.App.5th at p. 1133.)  As the court in *Elias* observed, " 'It is well established, in California and elsewhere, that a court has both the inherent authority and responsibility to fairly and efficiently administer all of the judicial proceedings that are pending before it, and that one important element of a court's inherent judicial authority in this regard is "the power . . . to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." ' " (*Elias, supra*, 78 Cal.App.5th at p. 941.)

In sum, as of the time in question here, the San Francisco Superior Court had made reasonable progress under continued challenging circumstances.  This is not to suggest continued improvements need not be made.  The superior court must protect defendants' speedy trial rights and should be continually considering ways to expedite these cases.  But as the court in *Elias* explained, the superior court is in the best position to exercise its judgment, weigh competing interests, and maintain an even balance. (*Elias, supra*, 78 Cal.App.5th at p. 941.)

### *Conclusion*

The COVID-19 pandemic and its adverse impacts on the superior court did not end when the court reopened.  After reopening, the court had to address not only the backlog that had developed during the closure of the courts, but also the new cases that continued to be filed.  And even though the court reopened, the COVID-19 pandemic continued to wreak havoc, with

judicial officers, court staff, sheriff's deputies, attorneys, defendants, and jurors contracting COVID-19, being required to quarantine due to exposure, or having to care for family members. Thus, the persistence of a backlog during the time period at issue here was principally the result of continuing sequelae of the COVID-19 pandemic. Not only the pandemic, itself, but its length, seriousness, and continuing effects were unexpected and unanticipated, and certainly resulted in exceptional and extraordinary circumstances. Accordingly, the superior court did not, in the instant cases, abuse its discretion in concluding that exceptional circumstances justified continuance of petitioners' trials past their statutory last days. Nor did it err in denying petitioners' motions for dismissal.

## DISPOSITION

The petitions for writs of mandate or prohibition are denied, and the order to show cause is discharged. The previously imposed stays of the trial in both matters are lifted.

_____
Banke, J.

We concur:


_____
Margulies, Acting P.J.


_____
Swope, J.*










**Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.




A166474, Estrada v. Superior Court

Filed 3/2/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MIGUEL ANGEL ESTRADA,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Respondent;<br><br>THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Real Party in Interest. | A166474<br><br>(San Francisco City & County Super. Ct. No. 21008360) |
| ANDREW KUHAIKI,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Respondent;<br><br>THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Real Party in Interest. | A166508<br><br>(San Francisco City & County Super. Ct. No. 22004424)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter, filed on February 28, 2023, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good

1

cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:                                         _____

                                               Margulies, Acting P. J.

Trial Court:San Francisco City and County Superior Court

Trial Judge:        Hon. Christopher C. Hite

Counsel:

Oliver Kroll, Christopher Fox-Lent, Manohar Raju and Carmen Aguirre, Public Defenders, Matt Gonzalez, Chief Attorney, for Petitioners.

Clyde & Co US LLP, Alison Beanum and Douglas Collodel for Respondent.

District Attorney, Maria Shih and Natalie Fuchs, for Real Parties in Interest.